# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| International Global Bank, NV<br><br>*Plaintiff*<br><br>v.<br><br>ItalBank International Inc.<br><br>*Defendant* | CIVIL CASE NO. |

## COMPLAINT

Plaintiff, International Global Bank, NV ("IGB"), formerly known as South American International Bank N.V. ("SAI Bank"), sues Defendant ItalBank International Inc. ("ItalBank"), and alleges:

## I.    PARTIES, JURISDICTION AND VENUE

1.    IGB is an international bank that is incorporated and operates under the laws of Curaçao. Its principal office is located at Berg Arraray Z/N Bridges Offices, 2nd Floor, Willemstad, Curaçao.

2.    IGB's sole owner is Oostenrijkse, a Curaçao private foundation.

3.    ItalBank International Inc. ("ItalBank") is an international bank incorporated under the laws of the Commonwealth of Puerto Rico. Its principal office is located at Bolivia 33 Building Apt. 1-A 33, Bolivia Street, San Juan, PR, 00917.

4.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a), as this is an action for damages exceeding $75,000.00, excluding interest, costs, and attorney's fees, and there is complete diversity among the parties.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) & (2), ItalBank resides in this District, and a substantial part of the events giving rise to the claim occurred in this District.

## II.      GENERAL ALLEGATIONS

### A.      The Improper Blocking of IGB/SAI Bank's Funds.

6.      On or about August 10, 2017, SAI Bank (now IGB) and ItalBank entered into the written Correspondent Bank Agreement attached as Exhibit "A" (the "CBA"). In accordance with the terms of the CBA, ItalBank was IGB's correspondent bank in the U.S. and provided IGB with a bank account for processing transactions in U.S. dollars (the "CBA Account").[1]

7.      The CBA is construed to be a "Puerto Rico Contract," and the parties' rights, obligations, and liabilities thereunder are to be subject to and construed under the laws of the United States and the Commonwealth of Puerto Rico. *See* Exh. "A" at 10.

8.      SAI Bank owned the funds deposited into the CBA Account, and the CBA required ItalBank to exercise "due care" over IGB's funds. *See* Exh. "A" at 1.

9.      On or about July 9, 2019, ItalBank blocked $4,359,746.92 from SAI Bank's bank account in alleged compliance with the regulations enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") related to Venezuela. As a result of this blocking, ItalBank placed the $4,359,746.92 at the disposal of OFAC.

10.     ItalBank's blocking of the funds was wrongful. Neither OFAC nor any other U.S agency requested ItalBank to block SAI Bank's funds. Moreover, the $4,359,746.92 did not relate to any attempted or pending transaction subject to OFAC Sanctions.

11.     Neither IGB, nor SAI Bank has ever been included by OFAC on the Specially Designated Nationals ("SDN") List or any other Sanctions list.

---

[1]      The last four digits of this bank account are 0416.

12.     None of IGB's owners, directors, officers, or employees have ever been included by OFAC on the SDN List or any other Sanctions List.

13.     The blocking of SAI Bank's funds was the result of ItalBank's wrongful attempt to retroactively block funds that had already been processed for Consulting and Services Associate, S.A. ("CSA"), a former customer of IGB. These funds were no longer in the custody, possession, or control of SAI Bank.

14.     CSA was a *société anonyme* formed under the laws of Switzerland that engaged in consulting and other professional services associated with the purchase and sale of petroleum. CSA rendered these services for various companies located throughout the world looking to purchase, sell, or acquire crude oil or petroleum-based raw materials from various global suppliers.

15.     CSA had a bank account with SAI Bank/IGB (and not with ItalBank), which was active between 2018 and 2019.[2] This account was separate and distinct from the CBA Account.

16.     While performing its due diligence on CSA, IGB identified that CSA had entered into a consulting agreement (the "Consulting Agreement") with TIPCO, a Thailand-based company engaged in the manufacture and distribution of asphalt and petroleum products. Pursuant to the terms of the Consulting Agreement, CSA provided TIPCO with certain cargo transportation-related support services associated with a separate supply contract dated January 13, 2014 (the "Supply Contract") by and between TIPCO and Petróleos de Venezuela ("PdVSA"), an oil company owned by the Government of Venezuela.

17.     Over the course of their banking relationship, CSA also provided SAI Bank with records reflecting that it had entered into consulting agreements with TIPCO that are unrelated to PdVSA.

---

[2]     The last four digits of CSA's bank account with SAI Bank are 0003.

18.    On January 28, 2019, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated PdVSA pursuant to Executive Order 13850 ("E.O. 13850") issued on November 1, 2018. PdVSA's designation blocks all of its property and interests in property to the extent they come within the possession or control of any U.S. person.

19.    As a result of E.O. 13850, and in an effort to comply with OFAC Sanctions and regulations, SAI Bank requested that CSA certify its relationship, if any, with PdVSA.

20.    In response to SAI Bank's request, CSA produced an "OFAC Certification" on or about February 19, 2019, advising that CSA was not conducting any direct or indirect businesses with Venezuelan government bodies, Venezuelan companies, or Venezuelan ventures or Venezuelan mixed companies.

21.    Relying on the OFAC Certification and other documents provided by CSA, SAI Bank processed seven wire transfers originated by TIPCO for ultimate credit to CSA (the "TIPCO Wires"). The dates and amounts of the wire transfers are as follows:

| Date | Amount |
|---|---|
| 4/11/2019 | $598,407.40 |
| 4/26/2019 | $736,921.00 |
| 5/13/2019 | $691.869.80 |
| 5/21/2019 | $905,357.42 |
| 5/29/2019 | $35,858.40 |
| 5/29/2019 | $722,588.10 |
| 6/12/2019 | $668,744.80 |

22.    The TIPCO Wires were made by TIPCO, not PdVSA, as payment for logistics services provided by CSA to TIPCO.  The TIPCO Wires were processed by TIPCO's bank in Thailand (TBank) and the Thai bank's correspondent bank in the U.S. (Wells Fargo) before

arriving to the CBA Account.

23.    After receiving the TIPCO Wires in the CBA Account, SAI Bank credited the relevant amounts to CSA's bank account.

24.    CSA transferred all of the funds relating to the TIPCO Wires out of its account with SAI Bank to other bank accounts of CSA and third parties.

25.    In 2019, SAI Bank conducted background check efforts on TIPCO using World-Check, a risk intelligence tool designed to screen individuals, entities, and transactions for potential compliance risks. World-Check did not identify TIPCO as a blocked entity because it had no record of TIPCO ever being sanctioned by OFAC or subjected to any publicly reported law enforcement actions in the U.S. or elsewhere.

26.    Also in 2019, as part of due diligence and monitoring efforts, SAI Bank requested CSA to produce information concerning CSA's customers. On July 8, 2019, CSA provided SAI Bank with information stating that TIPCO had made payments to PdVSA in connection with the purchase of crude oil.

27.    SAI Bank shared the information provided by CSA regarding TIPCO with ItalBank. On July 9, 2019, months after the TIPCO Wires, ItalBank "blocked" $4,359,746.92 from SAI Bank's account with ItalBank alleging compliance with OFAC regulations.

28.    ItalBank never sought OFAC's guidance before blocking the $4,359,746.92 from SAI Bank's account with ItalBank.

29.    ItalBank never advised SAI Bank that it was considering blocking $4,359,746.92 from SAI Bank's CBA account.

30.    The blocking of IGB's funds was the result of ItalBank's attempt to retroactively block the TIPCO Wires, months after those wires had been completed. But the funds coming from TIPCO into the CBA Account were no longer in SAI Bank's custody, possession, or control.

31.    The $4,359,746.92 that ItalBank blocked came from funds deposited into SAI

Bank's account with ItalBank by IGB or its customers, not including deposits from TIPCO. Between the date of the first TIPCO wire (April 11, 2019) and the date of the blocking (July 9, 2019), SAI Bank's account received $9,860,941.83 from sources different from TIPCO. Notably, on July 9, 2019, SAI Bank's account with ItalBank received $3,103,589 from sources unrelated to CSA or TIPCO. This amount included $2,000,000 from customer Novo Banco S.A., $100,000 from customer Autofacil SPA SAC, and $1,003,589 from the cancellation of a Certificate of Deposit that SAI Bank held with ItalBank.

32.     CSA no longer has a bank account with IGB. IGB/SAI Bank ceased processing wire transfers for CSA in July 2019; and was required to transfer the account balance to CSA ($939.644,48) on December 31, 2022, due to legal proceedings CSA initiated against IGB in Curaçao.

**B.     IGB's Efforts for OFAC to Unblock the $4,359,746,92.**

33.     Since the $4,359,746.92 belongs to IGB and not to any sanctioned entity or individual, no OFAC regulation authorized or any Government action required ItalBank to block IGB's funds. Further, ItalBank's blocking of IGB's funds was improper because the $4,359,746.92 did not relate to any attempted or pending transaction subject to OFAC screening.

34.     But a financial institution cannot unblock funds unless authorized by OFAC. Accordingly, IGB was required to engage attorneys to file a license application with OFAC, and conduct legal efforts with that agency, for the unblocking of the funds.

35.     IGB filed its license application with OFAC on September 9, 2020, under the case number Venezuela–EO13850-2020-369648-1.

36.     Despite IGB's persistent outreach to OFAC for updates on its license application, OFAC has yet to unblock the funds.

37.     ItalBank has not conducted any efforts with OFAC for the unblocking of the

$4,359,746.92.

**C.     IGB Discovers That ItalBank Blocked the $4,359,746.92 in Bad Faith.**

38.     On June 22, 2023, IGB commenced an *ex parte* application styled *In Re: Ex Parte Application of International Global Bank N.V* (Misc. No. 23-mc-337), seeking the Court's assistance to obtain evidence with which to prepare a civil lawsuit against CSA to be filed in Curaçao.

39.     On August 7, 2023, the Court granted IGB's Application and authorized IGB to issue a third-party subpoena directed at ItalBank.

40.     In compliance with IGB's subpoena, Mr. Rogelio Cardozo, the CEO and corporate representative of ItalBank, appeared for a deposition on March 12, 2024. During his testimony, Mr. Cardozo admitted that the $4,359,746.92 belonged to IGB and confirmed that there was no pending wire transfer of that amount at the time the funds were blocked. He was unable to provide a clear explanation of the findings that justified the blocking of the $4,359,746.92 and testified that ItalBank did not prepare any report detailing the investigation that led to the blocking of these funds.

41.     Additionally, in response to IGB's subpoena, ItalBank produced the Report of Blocked Transactions that it submitted to OFAC in connection with the blocking of the $4,359,746.92. In this report, ItalBank falsely claimed that it had blocked $4,359,746.92 from a transaction dated June 12, 2019. No such transaction took place. ItalBank also incorrectly informed OFAC that the beneficiary of these funds was CSA, rather than IGB.

42.     ItalBank has not corrected the misrepresentations it made to OFAC in its Report of Blocked Transactions about the $4,359,746.92.

43.     ItalBank blocked the $4,359,746.92 while it was under scrutiny by the U.S. Government due to allegations of its involvement in illegal transactions with PdVSA.

44.    Upon information and belief, ItalBank blocked IGB's $4,359,746.92 as a misguided and halfhearted attempt to curry favor with the U.S. Government.

**D.    Damages Caused by ItalBank's Mismanagement of IGB's Funds.**

45.    ItalBank's improper blocking of the $4,359,746.92 deprived IGB of its ability to use or control its property. Once funds are blocked under OFAC regulations, they are placed into an account from which only OFAC-authorized debits may be made.

46.    The blocking of the $4,359,746.92 led to a material deterioration of IGB's cash reserves, including a worsening of important financial ratios. This prompted the Central Bank of Curaçao and Sint Maarten to investigate IGB's compliance with liquidity requirements set forth by that regulator and demand that IGB undertake recapitalization efforts.

47.    IGB's inability to access these funds also led to a loss of liquid assets. This reduction in liquidity has decreased the amount of funds it can lend or invest, resulting in lost business opportunities.

48.    As a result of ItalBank's improper blocking of its funds, IGB has also been subjected to litigation, ordered to pay third parties' damages resulting from this blocking, and also incurred significant legal expenses.

49.    Because it was deprived of the $4,359,746.92, IGB was unable to complete pending wire transfers to its customers. Consequently, IGB's customers, including CSA, initiated litigation against IGB in Curaçao. In these cases, the courts in Curaçao mandated that IGB pay damages to its customers. Additionally, IGB had to hire legal counsel in Curaçao to represent it in these proceedings.

50.     In August 2024, while preparing to commence this action, IGB learned that third parties were seeking to garnish its funds in *Carlos Eduardo Marrón et al. v. Nicolás Maduro Morros* et al. (Case No. 1:21-CV-23190-FAM), a case pending in the Southern District of Florida

(the "Florida Case"). In that case, the plaintiffs obtained a multimillion-dollar judgment against Venezuelan officials, including Nicolás Maduro and Tarek El Aissami.

51.    The plaintiffs in the Florida Case sought to garnish the $4,359,746.92, alleging that these funds belong to CSA and that CSA is an instrumentality of the defendants in that case.

52.    In support of their motion to garnish the $4,359,746.92, the plaintiffs of the Florida Case attached the Report of Blocked Transactions that ItalBank submitted to OFAC on or about July 9, 2019. Because this report is not a document available for public consumption, plaintiffs most likely obtained this record from ItalBank.

53.    Also in support of their motion to garnish the $4,359,746.92, the plaintiffs in the Florida Case attached internal documents from ItalBank referencing ItalBank's relationship with, and actions regarding, SAI Bank.

54.    ItalBank never informed IGB that it would be providing the plaintiffs in the Florida Case with records concerning the CBA Account.

55.    Upon information and belief, ItalBank provided these internal documents concerning SAI Bank to the plaintiffs in the Florida Case to assist them in garnishing IGB's $4,359,746.92, in exchange for ItalBank receiving a portion of the funds.

56.    Following IGB's notification to the plaintiffs in the Florida Case that IGB owns the $4,359,746.92, and not CSA, the plaintiffs withdrew their motion for a writ of garnishment, *without prejudice*.

57.    IGB was required to engage counsel to represent it in the Florida Case, leading to the payment of attorneys' fees and costs.

58.    In all, IGB estimates that it has suffered no less than $2,221,625.73 in monetary damages due to ItalBank's wrongful blocking of IGB's $4,359,746.92, which do not include, but are in addition to the blocked funds. These amounts will increase, given IGB's continued exposure to additional litigation, regulatory actions, and ongoing loss of business opportunities.

59.     As a result of ItalBank's actions and omissions, IGB has incurred costs, which include and are not limited to legal fees.

60.     All conditions precedent to this action have been performed, excused, or waived.

**E.     ItalBank's Misguided Attempt to Bypass this Court's Jurisdiction.**

61.     Despite IGB's efforts to resolve this dispute without court action, ItalBank has continued to deny that its actions wrongfully damaged IGB and taken affirmative actions to prevent IGB from filing suit in this Court.

62.     Upon learning that IGB planned to commence this action, on or about September 5, 2024, ItalBank filed a Demand for Arbitration with the American Arbitration Association's ("AAA") International Center for Dispute Resolution ("ICDR"), seeking to refer the disputes concerning the mismanagement of IGB's funds to arbitration. A copy of ItalBank's Demand for Arbitration is attached as Exhibit "B."

63.     But the CBA clearly states that this Court is the forum with jurisdiction to resolve any claims related to the CBA, not an arbitrator.  The CBA contains a forum selection clause stating that IGB ". . . hereby irrevocably submits to the exclusive jurisdiction of the Commonwealth of Puerto Rico courts, sitting in San Juan, for any action or proceeding arising out of or concerning the [CBA] Account." Exh. "1," at 10.

64.     In support of its Demand for Arbitration, ItalBank cites an arbitration clause contained in a "Financial Services Agreement" attached as Exhibit "C," which is dated July 6, 2017 (the "FSA"). *See* Exh. "B," ¶ 24. However, IGB/SAI Bank never signed such agreement or otherwise consented to arbitrate the claims alleged in this Complaint.

65.     In an attempt to support the notion that IGB consented to the FSA, ItalBank attaches an undated "Signature Card" to its Demand for Arbitration that includes the signatures of three current IGB officials. *Id*. at ¶ 25. However, this form does not demonstrate IGB's consent to the FSA. Nothing on the face of the document connects it to the FSA. Moreover, none of the

individuals who supposedly signed the Signature Card were working for IGB on July 6, 2017, the date on which IGB purportedly entered into the FSA with ItalBank. The Signature Card also states that the four IGB officials executed it on behalf of "International Global Bank NV," but in 2017 the bank's name was SAI Bank, not IGB.

66.    IGB officials first learned of the FSA on or about August 21, 2024, after ItalBank's counsel provided it upon discovering IGB's intent to sue.

67.    In the CBA, IGB expressed its intention not to arbitrate any claims related to the CBA Account. Notably, the CBA contains a forum selection clause stating that "[IGB] hereby irrevocably submits to the exclusive jurisdiction of the Commonwealth of Puerto Rico courts, sitting in San Juan, for any action or proceeding arising out of or concerning the Account." Exh. "A" (CBA) at 10.

68.    With its Demand for Arbitration, ItalBank is attempting to prevent IGB from resolving its claims in the forum agreed and set by the CBA and from availing itself of the Federal Rules of Civil Procedure and Evidence.

69.    On September 12, 2024, ICDR acknowledged receipt of ItalBank's Demand for Arbitration under Case Number 01-24-0007-6223 and requested IGB to appear for an administrative conference with ICDR on September 20, 2024.

70.    ICDR has advised IGB that it should file an answering statement with ItalBank and ICDR by September 26, 2024, and otherwise proceed according to AAA's Commercial Arbitration Rules. However, the arbitrator has yet to be appointed.

## COUNT I – BREACH OF CONTRACT

71.    IGB re-alleges paragraphs 6 to 70 as if set forth fully herein.

72.    Article 1158 of the Puerto Rico Civil Code provides that a party who breaches an obligation must indemnify the damages caused by said breach. P.R. Laws Ann. tit. 31, § 9303.

This duty to indemnify extends to both actual damages and loss of future earnings which are foreseen or foreseeable from the date of the agreement. P.R. Laws Ann. tit. 31, §§ 9331 & 9332.

73.    On or about August 10, 2017, IGB (as SAI Bank) and ItalBank entered into the CBA.

74.    The CBA required ItalBank to exercise "due care" over IGB's funds.  Exh. "A" at 1. Similarly, under Puerto Rico law, the depository of a *res* pursuant to an agreement is required to safeguard the *res* and return it to the depositor upon request. P.R. Laws Ann. tit. 31, § 10511.

75.    ItalBank breached its obligation to exercise due care in managing IGB's funds and to safeguard said funds by:

a.    Blocking the $4,359,746.92 from the CBA Account in bad faith.

b.    Failing to prepare any report detailing the investigation that led to the blocking of the $4,359,746.92.

c.    Not conducting efforts with OFAC for the release of the $4,359,746.92.

d.    Falsely informing OFAC that the $4,359,746.92 belonged to CSA, rather than IGB, in the Report of Blocked Transactions.

e.    Falsely informing OFAC that it blocked the $4,359,746.92 in connection with a transaction of June 12, 2019.

f.    Not correcting the misrepresentations that it made to OFAC in its Report of Blocked Transactions about the $4,359,746.92.

g.    Providing documents concerning the CBA Account to the plaintiffs in the Florida Case without giving notice to IGB.

76.    As a result of ItalBank's breach of the CBA, IGB has been damaged as more fully set forth above.  IGB estimates that it has suffered no less than $2,221,625.73 in monetary damages

due to ItalBank's wrongful blocking of IGB's $4,359,746.92, which do not include, but are in addition to the blocked funds.

### COUNT II– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

77.    IGB re-alleges paragraphs 6 to 70 as if set forth fully herein.

78.    On or about August 10, 2017, IGB (as SAI Bank) and ItalBank entered into the CBA.

79.    ItalBank had a duty to act in good faith toward IGB while fulfilling the terms of the CBA. All contracts under Puerto Rico law are subject to an implied covenant of good faith and fair dealing. P.R. Laws Ann. tit. 31, § 8983. *See also Cantellops v. Álvaro-Chapel*, 234 F.3d 741, 744 (1st Cir. 2000). This duty of good faith applies to contract performance. *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 108-09 (1st Cir. 2001).

80.    "In determining whether liability attaches in a particular instance [for breach of the duty of good faith], an inquiring court typically examines the totality of the circumstances." *Punta Lima, LLC v. Punta Lima Dev. Co.*, LLC, 440 F. Supp. 3d 130, 154 (D.P.R. 2020) (citing *New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 12 (1st Cir. 2002)). "Liability exists if, in light of all the surrounding circumstances, the party's actions appear arbitrary, deceitful, or animated by some improper purpose." *Punta Lima*, 440 F. Supp. 3d at 154.

81.    ItalBank breached its duty of good faith to IGB by taking the following arbitrary actions:

    a.    Blocking the $4,359,746.92 from the CBA Account in bad faith.

    b.    Failing to prepare any report detailing the investigation that led to the blocking of the $4,359,746.92.

    c.    Falsely informing OFAC that the $4,359,746.92 belonged to CSA, rather than IGB, in the Report of Blocked Transactions.

> d.      Falsely informing OFAC that it blocked the $4,359,746.92 in connection with a transaction of June 12, 2019.

> e.      Providing documents concerning the CBA Account to the plaintiffs in the Florida Case without giving notice to IGB.

82.     ItalBank also breached its duty of good faith to IGB because the blocking of $4,359,746.92 from the CBA Account was driven by an improper purpose, namely currying favor with the U.S. Government.

83.     As a result of ItalBank's actions, IGB has been damaged.  as more fully set forth above.  IGB estimates that it has suffered no less than $2,221,625.73 in monetary damages due to ItalBank's wrongful blocking of IGB's $4,359,746.92, which do not include, but are in addition to the blocked funds.

## COUNT III – *DOLUS*

84.     IGB re-alleges paragraphs 6 to 70 as if set forth fully herein.

85.     *Dolus* entails bad faith in the formation or performance of a contract. *See Casco, Inc. v. John Deere Constr. & Forestry Co*., 990 F.3d 1, 11 (1st Cir. 2021).

86.     ItalBank acted with bad faith in the performance of its obligations under the CBA by:

> a.      Blocking the $4,359,746.92 from the CBA Account in bad faith.

> b.      Failing to prepare any report detailing the investigation that led to the blocking of the $4,359,746.92.

> c.      Not conducting efforts with OFAC for the release of the $4,359,746.92.

> d.      Falsely informing OFAC that the $4,359,746.92 belonged to CSA, rather than IGB, in the Report of Blocked Transactions.

    e.      Falsely informing OFAC that it blocked the $4,359,746.92 in connection with a transaction of June 12, 2019.

    f.      Not correcting the misrepresentations that it made to OFAC in its Report of Blocked Transactions about the $4,359,746.92.

    g.      Providing documents concerning the CBA Account to the plaintiffs in the Florida Case without giving notice to IGB.

    h.      Blocking the $4,359,746.92 to curry favor with the U.S. Government.

87.      Pursuant to Article 1168 of the Civil Code, a breaching party who incurs in *dolus* is liable for all damages that arise from his or her breach of the corresponding obligation. P.R. Laws Ann. tit. 31, § 9332.

88.      As a result of ItalBank's *dolus* and bad faith, IGB has suffered damages as more specifically alleged above.  IGB estimates that it has suffered no less than $2,221,625.73 in monetary damages due to ItalBank's wrongful blocking of IGB's $4,359,746.92, which do not include, but are in addition to the blocked funds.

89.      Additionally, Article 1538 of the Puerto Rican Civil Code provides that, when the defendant's act or omission is done with intent, or with serious disregard for the property of the plaintiff, punitive damages may be imposed, which shall not exceed "the amount of the damage caused." P.R. Laws Ann. tit. 31, § 10803.

## COUNT IV – BREACH OF TRUST

90.      IGB re-alleges paragraphs 6 to 60 as if set forth fully herein.

91.      IGB placed its trust in ItalBank by designating it as IGB's correspondent bank pursuant to the CBA.

92.      ItalBank owed IGB certain fiduciary duties, including the duties of care, loyalty, and good faith.

93.    ItalBank breached its fiduciary duties to IGB by:

    a.    Blocking the $4,359,746.92 from the CBA Account in bad faith.

    b.    Failing to prepare any report detailing the investigation that led to the blocking of the $4,359,746.92.

    c.    Not conducting efforts with OFAC for the release of the $4,359,746.92.

    d.    Falsely informing OFAC that the $4,359,746.92 belonged to CSA, rather than IGB, in the Report of Blocked Transactions.

    e.    Falsely informing OFAC that it blocked the $4,359,746.92 in connection with a transaction of June 12, 2019.

    f.    Not correcting the misrepresentations that it made to OFAC in its Report of Blocked Transactions about the $4,359,746.92.

    g.    Providing documents concerning the CBA Account to the plaintiffs in the Florida Case without giving notice to IGB.

    h.    Blocking the $4,359,746.92 to curry favor with the U.S. Government.

94.    As a result of ItalBank's actions, IGB has suffered damages as more specifically alleged above. IGB estimates that it has suffered no less than $2,221,625.73 in monetary damages due to ItalBank's wrongful blocking of IGB's $4,359,746.92, which do not include, but are in addition to the blocked funds.

**COUNT V – CONVERSION**

95.    IGB re-alleges paragraphs 6 to 60 as if set forth fully herein.

96.    Article 1536 of the Puerto Rico Civil Code provides that any person who causes injury to another due to fault or negligence is obligated to repair said injury. P.R. Laws Ann. tit. 31, § 10801.

97.     The $4,359,746.92 that ItalBank blocked on or about July 9, 2019 are property of IGB.

98.     ItalBank's intentionally blocked IGB's funds and deprived IGB of all access to them, their use, and their possession.

99.     ItalBank's blocking of these funds is wrongful because:

    a.     Neither OFAC nor any other U.S. agency requested ItalBank to block IGB's funds.

    b.     The $4,359,746.92 belongs to IGB and not to any sanctioned entity or individual.

    c.     The $4,359,746.92 did not relate to any attempted or pending transaction subject to OFAC screening.

100.     ItalBank blocked IGB's funds in bad faith because:

    a.     At the time of the blocking, ItalBank knew that the $4,359,746.92 were property of IGB.

    b.     At the time of the blocking, ItalBank knew that the $4,359,746.92 came from funds deposited into SAI Bank's account with ItalBank by IGB or its customers, not including deposits from TIPCO.

    c.     ItalBank failed to prepare any report detailing the investigation that led to the blocking of the $4,359,746.92.

    d.     No OFAC regulation authorized ItalBank to block IGB's funds.

    e.     ItalBank falsely informed OFAC that the $4,359,746.92 belonged to CSA, rather than IGB.

      f.      ItalBank falsely informed OFAC that it blocked the $4,359,746.92 from a fictitious transaction purportedly dated June 12, 2019.

      g.      Upon information and belief, ItalBank purposefully blocked the $4,359,746.92 to curry favor with the U.S. Government.

101.    As a result of ItalBank's wrongful blocking of the $4,359,746.92, IGB has been deprived of its property's use and possession.

102.    IGB never consented to ItalBank's wrongful blocking of its funds.

103.    ItalBank has not conducted any efforts for OFAC to release the $4,359,746.92.

104.    ItalBank has further attempted to deprive IGB of its property by assisting the plaintiffs in the Florida action with their efforts to garnish the $4,359,746.92.

105.    As a result of ItalBank's actions, IGB has been damaged. as more fully set forth above.  IGB estimates that it has suffered no less than $2,221,625.73 in monetary damages due to ItalBank's wrongful blocking of IGB's $4,359,746.92, which do not include, but are in addition to the blocked funds.

106.    IGB is also entitled to an award of punitive damages, pursuant to Article 1538 of the Puerto Rico Civil Code as more fully alleged above. *See supra* at ¶ 89.

### COUNT VI – NEGLIGENCE

107.    IGB re-alleges paragraphs 6 to 60 as if set forth fully herein.

108.    Article 1536 of the Puerto Rico Civil Code provides that any person who causes injury to another due to fault or negligence is obligated to repair said injury. P.R. Laws Ann. tit. 31, § 10801.

109.    "Under Puerto Rico law, the elements of negligence are (1) an injury, (2) a breach of duty, and (3) proximate causation." *Colón v. United States*, 928 F. Supp. 2d 376, 385 (D.P.R. 2012) (citing *Vázquez-Filippetti v. Banco Popular de P.R.*, 504 F.3d 43, 49 (1st Cir. 2007)).

110.  ItalBank had a duty to act with reasonable care towards IGB.

111.  A duty of reasonable care "is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." *Vázquez-Filippetti*, 504 F.3d at 49 (citing *Ortiz v. Levitt & Sons of P.R., Inc.*, 1 P.R. Offic. Trans. 407, 101 P.R. Dec. 290 (1973)).

112.  ItalBank did not act as a prudent reasonable bank under the circumstances by:

    a.  Blocking the $4,359,746.92 from the CBA Account in bad faith.

    b.  Failing to prepare any report detailing the investigation that led to the blocking of the $4,359,746.92.

    c.  Not conducting efforts with OFAC for the release of the $4,359,746.92.

    d.  Falsely informing OFAC that the $4,359,746.92 belonged to CSA, rather than IGB, in the Report of Blocked Transactions.

    e.  Falsely informing OFAC that it blocked the $4,359,746.92 in connection with a transaction of June 12, 2019.

    f.  Not correcting the misrepresentations that it made to OFAC in its Report of Blocked Transactions about the $4,359,746.92.

    g.  Providing documents concerning the CBA Account to the plaintiffs in the Florida Case without giving notice to IGB.

113.  ItalBank's breach of its duty to act with reasonable care towards IGB caused IGB to indefinitely lose access to the $4,359,746.91.

114.  As a result of ItalBank's breach of its duty to act with reasonable care towards IGB, IGB has been damaged as more fully set forth above.  IGB estimates that it has suffered no less than $2,221,625.73 in monetary damages due to ItalBank's wrongful blocking of IGB's $4,359,746.92, which do not include, but are in addition to the blocked funds.

115.     IGB is also entitled to an award of punitive damages, pursuant to Article 1538 of the Puerto Rico Civil Code as more fully alleged above. *See supra* at ¶ 89.

## COUNT VII – INVASION OF PRIVACY AND DISCLOSURE OF CONFIDENTIAL INFORMATION

116.     IGB re-alleges paragraphs 50 to 55 as if set forth fully herein.

117.     Article 1536 of the Puerto Rico Civil Code provides that any person who causes injury to another due to fault or negligence is obligated to repair said injury. P.R. Laws Ann. tit. 31, § 10801.

118.     ItalBank had a duty to safeguard, keep secret and confidential IGB's personal financial information, pursuant to the Gramm-Leach-Bliley Act and the Puerto Rico Citizen Information on Data Banks Security Act, Act No. 111 of 2005, among other statutes.

119.     ItalBank breached this duty by providing documents concerning the CBA Account to the plaintiffs in the Florida Case without giving notice to IGB.

120.     As a result of ItalBank's breach of this duty, IGB has suffered damages as more specifically alleged above.

## COUNT VIII – INJUNCTION[3]

121.     IGB re-alleges paragraphs 61 to 70 as if set forth fully herein.

122.     "[T]he power to enjoin an arbitration is 'the concomitant of the power to compel arbitration,' . . . the same provision of the FAA, 9 U.S.C. § 4, authorizes both types of orders." *PCS 2000 LP v. Romulus Telecommunications, Inc.*, 148 F.3d 32, 35 (1st Cir. 1998).  Moreover, pursuant to 28 U.S.C. § 1651(a), District Courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

123.     On September 5, 2024, ItalBank filed its Demand for Arbitration with the ICDR.

---

[3]     IGB will file a Motion for Preliminary Injunction with Incorporated Memorandum of Law simultaneously with the filing of this Complaint.

But IGB has not agreed to arbitrate the claims alleged in this Complaint against ItalBank.

124.    The CBA does not include an arbitration clause. On the contrary, the CBA contains a forum selection clause confirming that any action or proceeding arising out of or concerning the CBA Account must be resolved by a Court sitting in San Juan, Puerto Rico.

125.    In support of its Demand for Arbitration, ItalBank cites an arbitration clause contained in the FSA. However, IGB/SAI Bank has not signed that agreement.

126.    In support of its claim that IGB is bound by the FSA, ItalBank attached a "signature form" to its Demand for Arbitration that appears to include the signatures of four current IGB officials. However, none of the IGB officials in question signed the form that ItalBank attached, and nothing on the face of the form connects it to the FSA.

127.    If forced to arbitrate the claims asserted in this Complaint, IGB will suffer harm that cannot be adequately remedied by monetary damages.  Arbitration will deprive the Plaintiff of the protections afforded by the judicial process, including its rights to appeal and access to discovery procedures. Furthermore, arbitration with the ICDR will force Plaintiff to incur unjustified expenses, including the ICDR's administrative fees and compensation for the arbitrator(s) appointed to the case.

128.    ItalBank will suffer no harm if not allowed to continue with the arbitration proceedings. ItalBank will still have the opportunity to resolve the dispute in this Court, a forum that both ItalBank and IGB are equally entitled to access.

129.    Public interest is served by upholding the principle that arbitration is a matter of contract, and that parties should only be bound by arbitration when they have expressly agreed to it. Moreover, the public interest is also served by conserving limited administrative forum resources from being expended on cases where the arbitration award would be negated on appeal.

130.    Protecting parties like IGB from being compelled into arbitration without consent helps protect businesses from being subject to unfair arbitration proceedings and ensures that

parties enter arbitration with a clear understanding and acceptance of the applicable rules.

## PRAYER FOR RELIEF

WHEREFORE, IGB respectfully requests that this Court enter Judgment against ItalBank and grant the following relief:

- An award of damages of no less than $2,221,625.73, corresponding to IGB's actual damages;

- An *additional* award of no less than $2,221,625.73, corresponding to punitive damages;

- An order compelling ItalBank to reimburse IGB for the blocked funds of $4,359,746.92;

- An order enjoining ItalBank from commencing or continuing an arbitration for the claims asserted herein, and

- Any other relief this Court deems just and appropriate.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury on all matters so triable.


DATE: September 19, 2024.                Respectfully submitted,

MONSERRATE SIMONET & GIERBOLINI, LLC
101 San Patricio Ave., Suite 1120
Guaynabo, PR 00968
Telephone (787) 620-5300

By: */s/ Dora L. Monserrate*
Dora L. Monserrate
U.S.D.C.-P.R. No. 212,612
Attorney Email: dmonserrate@msglawpr.com
Fernando J. Gierbolini U.S.D.C.-P.R. No. 211,901
Attorney Email: fgierbolini@msglawpr.com
Richard J. Schell U.S.D.C.-P.R. No. 305,811
Attorney Email: rschell@msglawpr.com

DIAZ REUS & TARG, LLP
100 Southeast Second Street, Suite 3400
Miami, Florida 33131
Telephone (305) 375-9220

Michael Diaz, Jr. (Florida Bar No. 606774)
Attorney Email: mdiaz@diazreus.com
(*Motion for Pro Hac Vice Admission Pending*)
Javier Coronado Diaz (Florida Bar No. 1047848)
Attorney Email: jcoronado@diazreus.com
(*Motion for Pro Hac Vice Admission Pending*)
Ethan Rodriguez (Florida Bar No. 1036022)
Attorney Email: erodriguez@diazreus.com
(*Motion for Pro Hac Vice Admission Pending*)


*Counsel for Plaintiff International Global Bank N.V*